IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TONG XIONG,

    Petitioner,                                         No. CIV S-07-2689 JAM CHS P

    vs.

TOM FELKER, et al.,

    Respondents.           <u>FINDINGS AND RECOMMENDATIONS</u>

    _____/

## I. INTRODUCTION

Petitioner Tong Xiong is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. He is currently serving a 15 year-to-life sentence of imprisonment after a jury convicted him of second degree murder in the Sacramento County Superior Court, case 99F02458. For purposes of this opinion, petitioner's grounds for relief are consolidated into the following two claims: (A) ineffective assistance of counsel at trial, and (B) jury misconduct and denial of the right to contact jurors about the alleged misconduct.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following background summary was set forth in the unpublished opinion of the California Court of Appeal, Third District, case number C048798. (Lodged document 5.) Petitioner is the defendant referred to therein.

On December 9, 1998, Yeng Lee (Yeng) was driving a car with his wife in the front passenger seat, Kou Lee (Kou) behind her in the back seat and defendant sitting behind Yeng. Defendant and Kou were members of the True Blue street gang (True Blue), and Yeng was a member of the Black Tigers, a gang closely allied with True Blue.

At one point as they were driving, Kou told Yeng to back up because he saw a person who had "jumped" him. Yeng stopped the car and backed up. Kou told Yeng's wife to roll down her window and pull her seat forward, which she did. Jin Dao Lee (the victim), a member of a street gang called Junior Rascal Boys (JRB), was standing on the porch of the house where they had stopped.

Kou yelled "something about JRB" out of the window at the victim. While Kou was yelling, several gunshots were fired from the back seat of the car, fatally wounding the victim. Yeng's wife believed defendant fired the shots because she saw his hand outside the window with a gun and Kou was still leaning out of the window.

The four drove off, heading to defendant's residence. On the way, defendant and the co-defendants laughed about the shooting. At some point, Kou made a reference to the fact that he had been jumped and received a scar. When they arrived at defendant's residence, Yeng's wife saw defendant reach into the sunroof when he was getting out of the car.

Two days after the shooting, a .22-caliber semiautomatic pistol containing defendant's fingerprints was recovered from the garage at his residence. A criminalist concluded that spent cartridges recovered from the scene of the shooting had been fired from the recovered pistol.

During an interview with a police detective the following day, defendant's brother, Fue, reported he encountered defendant and the co-defendants at a cousin's house later on the day of the incident and they told him that they "shot a kid" who had "messed with" Kou at his house earlier in the day. Fue told the detective that defendant said he shot the victim.

Fue told another officer that True Blue was formed in 1992, while the Black Tigers formed "in the late eighties," with the Sacramento chapter organizing in 1996 after a soccer match resulted in a fight with another gang. Fue... identified several other Black Tigers members. Fue reported that JRB, the gang with which the victim was affiliated, was an enemy of the Black Tigers.

Evidence was presented that... sometime previously, defendant got into a fistfight with the JRB member at whose house the shooting

2

> occurred and that, when the rival gang member threatened defendant with a metal pipe, defendant left, saying he was going to get a gun to shoot him.
>
> Based on a hypothetical question mirroring the facts of the current offense, a gang expert testified such shootings benefit a gang and promote gang activity due to fear and intimidation.

(Lodged document 5 at 1-2)

Petitioner and two co-defendants were charged with murder, discharging a firearm at an inhabited dwelling, discharging a firearm from a motor vehicle at a person not in the vehicle, discharging a firearm from a motor vehicle, several firearm enhancements, a criminal street gang enhancement, and the special circumstance of intentional first degree murder perpetrated by discharging a firearm from a motor vehicle. (*Id*. at 1.) Petitioner's jury was unable to reach a verdict, and the court declared a mistrial. (*Id*.)

Upon retrial, petitioner was found guilty of murder in the second degree and all other counts. The second jury also found true that he was a principal in an offense in which a firearm was used, and that he committed the offenses for the benefit of a criminal street gang. *Id*. The enhancement for personal use of a firearm was found not true. (*Id*.) Petitioner was sentenced to a term of 15 years to life for the murder plus a consecutive term of 25 years to life for the firearm enhancement. (*Id*.) Sentences on the remaining counts were stayed, for a total sentence of 40 years to life. (*Id*.)

On direct appeal considering an insufficiency of the evidence claim, the state appellate court reversed the criminal street gang and firearm use enhancements and the single sentence thereon, affirming the judgment in all other respects. (C048798 opinion at 1-2.) Petitioner's sentence was reduced to 15 years to life. (*Id*.)

## II. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

The "contrary to" and "unreasonable application" clauses of §2254(d)(1) are different. Under the "contrary to" clause of §2254(d)(1), a Federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. As the Third Circuit has explained, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3rd Cir. 1999) (emphasis in original). It is not required that the state court cite the specific controlling test or Supreme Court authority, so long as neither the reasoning nor the result contradict same. *Early v. Packer*, 537 U.S. 3, 8-9 (2002).

The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case. *Williams*, 529 U.S. at 410. The focus of this inquiry is whether the state

court's application of clearly established Federal law is objectively unreasonable. *Id*. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*.

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003). A court may deny a petition for writ of habeas corpus on the ground that relief is precluded by 28 U.S.C. §2254(d) without addressing the merits of the claim. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

### III. ANALYSIS OF THE CLAIMS

A. Ineffective Assistance of Counsel

For his first claim, petitioner alleges that trial counsel rendered ineffective assistance of counsel when he "elicited inadmissible opinion testimony from the prosecution gang expert that gang members who are physically present at a crime scene necessarily intend to aid and abet other gang members." (Petition at 5.) Petitioner states that competent counsel would have known such evidence was inadmissible and also that the expert might give a damaging opinion in that regard. (*Id*.) He contends that he was prejudiced because his defense was that he was "merely present when a spontaneous act of violence by another passenger in the car occurred." (*Id*.)

A showing of ineffective assistance of counsel has two components. First it must be shown that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance,'" *Kimmelman v.*

*Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689), and that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

The second factor required for a showing of ineffective assistance of counsel is actual prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice may be found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

As to petitioner's ineffective assistance of counsel claim, the California Court of Appeal reasoned:

> On direct examination, the gang expert testified that part of "the code of conduct" of gang members is to back each other up if a confrontation occurs with a rival gang member. The expert explained that gang members have a "wolf-pack mentality" and agreed that gangs "often commit crimes in numbers." The expert was given a hypothetical situation in which three gang members with "a street gang mentality" see a rival gang member while traveling in a car and one of the individuals shoots the rival. The expert testified that, in his opinion, an offense committed under these circumstances would benefit the gang and promote its criminal activity by enhancing the gang's reputation and by preventing people from reporting crimes committed by the gang.
>
> On cross-examination, defense counsel questioned the expert about his opinion that the shooting would have been committed to promote gang activity. The expert testified that, in the hypothetical situation, he assumed the individuals were "acting in concert," however even if the shooting was a unilateral act by one of the gang members, the other gang members would be promoting gang activity by their presence in the car. The expert testified that gang members go out together to "have each other's back" and that, whatever happens, they approve of each other's actions. The expert insisted that the gang members would be promoting gang activity simply by being together, regardless of where they were going or the intent of each individual member. In an effort to clarify the expert's testimony, defense counsel asked whether a gang member who had no knowledge or intent that a shooting would occur would be promoting gang activity by simply sitting in the car during the

incident. The expert testified this would promote gang activity.

Defendant argues that the expert, here, rendered an improper opinion on defendant's mental state. Defendant portrays the expert's opinion to be that "gang members present in vehicles in groups are necessarily aiding and abetting each other in any criminal act performed by one occupant." We believe defendant has mischaracterized the expert's testimony.

Both on direct and cross-examination, the gang expert's testimony focused on the hypothetical question of whether, by being present in a car during a shooting, gang members would be promoting gang activity, *regardless* of the intent or knowledge of each gang member. The expert also testified generally to the expectations of gang members when they are out together and when they encounter rival gang members. Gang expert testimony is admissible on a host of issues, including the motivation for a particular crime (such as retaliation) and whether a crime was committed to benefit the gang. (*People v. Killebrew* (2002) 103.Cal.App.4th 644, 656-657 (Killebrew) and cases cited therein; People v. Zepeda (2001) 87 Cal.App.4th 1183, 1208-1209; People v. Valdez (1997) 58 Cal.App.4th 494, 508-509.) Evidence of what "gang members typically expect" under a given set of circumstances is also an appropriate subject for expert testimony. (People v. Olguin (1994) 31 Cal.App.4th 1355, 1371.) Accordingly, the expert's testimony on these subjects in the present matter was admissible.

To be sure, gang experts are not free to testify to any and all opinions they may have about gangs. (*Killebrew, supra,* 103 Cal.App.4th at p. 654.) And one area on which a gang expert may not offer an opinion is whether "a specific individual had specific knowledge or possessed a specific intent." (*Id.* at p. 658.) However, contrary to defendant's assertion, the gang expert did not testify to defendant's subjective knowledge or intent with regard to the shooting, except to state that an individual with a "gang mentality" will approve of whatever conduct is undertaken by his fellow gang members. Such testimony does not constitute an opinion that the gang member would be aiding and abetting the shooting, because aiding and abetting requires knowledge of the unlawful purpose of the perpetrator and an intent to commit, encourage or facilitate the crime. (CALJIC No. 3.01; *People v. Torres* (1990) 224 Cal.App.3d 763, 769-770.)

As the expert did not offer an opinion on defendant's mental state, defendant's claim that his trial attorney rendered ineffective assistance of counsel must fail.

(Lodged document 5 at 8-10)

Counsel's cross examination of the gang expert is before the court and has been reviewed. (Reporter's Transcript ("RT") at 720-29.) Based on a hypothetical question mirroring the facts of petitioner's offense first set forth in the prosecutor's direct examination, the expert testified that all individuals in the car with a "gang mentality" would be promoting gang activity solely by their presence in the car and that "whatever happens and what[ever] they encounter, they are all down for [it]. That's how gangsters work." (RT at 724.) In answering several follow up questions, the expert was unwavering on his opinion in this regard. Importantly, however, as the state appellate court noted, the expert was not asked about, nor did he specifically opine about, petitioner's mental state. The testimony was not inadmissible. (Lodged document 5 at 8-10).

Though admissible, the testimony was not particularly helpful to the defense. Indeed, it appears that counsel must have expected, at least initially, that the expert would respond differently, otherwise it is difficult to imagine why he decided to revisit the prosecutor's line of questioning. The Ninth Circuit has previously held that, under some circumstances, counsel's performance will fall below the objective standard of reasonableness where damaging testimony is elicited due to lack of preparation. *See Sechrest v. Ignacio*, 549 F.3d 789, 816-17 (9th Cir. 2008) (counsel elicited extremely damaging testimony from expert he selected, without first interviewing or preparing, during the penalty phase of a trial, resulting in a death sentence for his client). A different expert at petitioner's first trial had given the response that counsel presumably hoped would be repeated the second time around. (Petition at 5.) It thus appears that counsel took a calculated risk in asking the questions posed. Whether the calculated risk was one a reasonable attorney would take need not be decided. Petitioner's claim is foreclosed because he did not suffer actual prejudice.

On direct examination by the prosecutor, the expert had already testified about "gang mentality" and members' tendency to commit crime in numbers. (RT at 715.) As to the given hypothetical situation, he had already stated his opinion that it would have occurred to

promote the criminal activity of or otherwise benefit the gang. (RT at 717-19.) Defense counsel's follow up questions allowed the expert to clarify that his opinion would not change even if some of the occupants of the car did expect or intend for the shooting take place. Again, no opinion was offered as to *petitioner's* mental state or intent. Moreover, as the Sacramento County Superior Court explained in denying this claim in petitioner's habeas petition,

> the evidence at the second trial showed that the murder weapon, a .22 caliber handgun, was found in the garage of the house in which petitioner lived with his family, and petitioner's fingerprints were among those found on that handgun. Petitioner admitted to police that he was a member of the same gang as one of the co-defendants, and that the third co-defendant was in a different gang; that on occasion he had carried a .38 caliber revolver for protection against rival gang members, and that he was in the back seat of the car behind the driver at the time of the shooting. Petitioner's brother admitted telling various police officers on different occasions that petitioner had admitted shooting the victim. The wife of a co-defendant, who was in the front passenger seat of the car, on one occasion told an officer that petitioner and the other two co-defendants were all laughing as they drove away after the shooting, and that at some point during the events she saw petitioner place a handgun in the space between the ceiling and the sunroof.
>
> This alone is sufficient to rebut any indicia of prejudice from any purported error by trial counsel in asking the prosecution expert the question at issue. The parties were free to argue how the evidence should be interpreted, in closing, and whether a reasonable inference could be made from the evidence that, even if petitioner had not been the actual shooter, that he had the necessary mens rea required for an aider and abettor in the shooting.[1] As noted above, petitioner admits that the evidence showed he was a gang member, that he admitted the shooting to his brother, thereby admitting at least willing participation in the shooting even if he was not the actual shooter, that he laughed immediately after the shooting, that he had the gun probably immediately after the shooting and hid it between the ceiling and sunroof, and that he kept the gun after the shooting in the garage of his home. This all gave rise to the shooting and he continued to aid and abet by taking possession of the murder weapon and keeping it concealed from discovery. Even if the prosecution expert had not been asked the question by trial counsel, it is not reasonably probable that the outcome of the trial would have been different.

---

[1] At trial, the jury was instructed that one who aids and abets another in the commission of a crime is also guilty of that crime. (RT at 1603.)

9

(Lodged document 4 (06F03264 opinion) at 2.) Under these circumstances, petitioner has not satisfied the actual prejudice prong of the *Strickland*. He is not entitled to relief on his ineffective assistance of counsel claim.

   B. Investigation of Jury Misconduct/ Jury Misconduct

The background facts giving rise to petitioner's allegations in this regard were aptly summarized by the California Court of Appeal:

> At trial, Fue repeatedly testified he did not remember or did not know the answer to questions regarding the offense and the gangs involved. He also testified he did not remember statements he made to police personnel shortly after the offense. After a videotape of Fue's police interview was played for the jury, Fue acknowledged he told the detective that defendant said he shot someone, although Fue maintained defendant had not in fact said this. Fue could not explain why he reported this to the detective.
>
> On cross-examination, Fue said he had been "knocked out" before and he sometimes had memory problems. He testified that he was easily confused. Fue said he did not remember various testimony he gave during his direct and cross-examination and did not remember reading the transcript of his police interview that morning during his testimony. Fue testified that he could not identify the President of the United States or the Governor of California.
>
> According to defendant's trial attorney, after the verdicts were reached, members of the jury reported they had observed Fue talking on a cell phone in the courthouse during a recess and "it was clear that [he] was smarter than he tried to appear in court, understood more than he was letting on in court and did not appear confused whatsoever." Based on this information, defendant requested release of the jurors' contact information. In response, the court stated it would send a notice to the jurors apprising them of defendant's request and their right to be heard on the release of information as well as to specify the circumstances under which they would be willing to be contacted.
>
> At the next hearing, the trial court reported that 10 jurors responded to the court's inquiry but not all of these jurors were willing to discuss the matter. The court also stated jurors were informed that if they did not respond, they would be treated as if they did not want to be contacted. Defendant's trial counsel had no objection to this procedure.
>
> Subsequently, defendant filed a motion for a new trial based, in

part, on jury misconduct stemming from jurors' observations of Fue outside the courtroom. Attached to the motion were declarations from three jurors (Nos. 5, 9 and 10).

In Juror No. 5's declaration, he stated that he had observed Fue outside the courtroom on numerous occasions. According to Juror No. 5, although Fue was "slow and confused" while testifying, he appeared "normal and focused" outside the courtroom. Juror No. 5 recalled there had been a brief reference during deliberations to Fue's actions and demeanor outside the courtroom.

The declaration of Juror No. 9 stated that he saw Fue outside the courtroom using a cell phone on a few occasions and observed that Fue "was conversing not as a confused person" and that he "seemed to know what he was doing." According to Juror No. 9, this contrasted with Fue's behavior while testifying, which he described as " 'acting dumb.' " Juror No. 9 stated that some of the other jurors also felt that Fue "was pretending to be confused on the stand." According to Juror No. 9, there was a discussion of Fue's demeanor outside the courtroom while the jury was reviewing Fue's statement to the police.

Juror No. 10's declaration stated that he saw Fue outside the courtroom several times during breaks in the testimony, but he did not recall any discussion during deliberations contrasting Fue's in-court and out-of-court behavior. This juror noted that the jury broke into smaller groups at various times during deliberations.

The People filed an opposition to defendant's motion, attaching an additional statement from Juror No. 9. According to this statement, the jurors already had discussed that Fue was "acting dumb on the stand" and "couldn't be considered dependable as a witness" when his behavior outside the courtroom came up. Several "jurors spoke up and [said that] they [too] had seen" Fue talking on the cell phone. Juror No. 9 stated that the jurors "didn't waste that much time discussing" their observations of Fue outside the courtroom, maintaining that "it was just in passing." According to Juror No. 9, the jurors read the instructions twice "so that [they] were clear as to what [they] had to do to reach [their] verdict."

The trial court found jury misconduct occurred when the jurors discussed their out-of-court observations of Fue during deliberations. However, the trial court ruled "the extraneous information was not so prejudicial in and of itself as to cause inherent bias" and "there [wa]s not a substantial[ ] likelihood of actual bias ... relative to any of the jurors." The court noted that the cross-examination of Fue thoroughly undermined his credibility, noting that, in his videotaped interview (which was played for the jury), Fue "was clear on all the essential details," whereas his testimony in court was so replete with memory lapses that it was "comical." The court stated it was "swayed" by Juror No. 9's

11

statement to the prosecution that the jurors already had reached a determination regarding Fue's credibility when the subject of Fue's behavior outside the courtroom was discussed and that they did not spend much time discussing the matter. Accordingly, the trial court denied defendant's motion for a new trial.

(Lodged document 5 at 10-11.)

      1.   Due Process Right to Investigate Jury Misconduct

Petitioner first alleges that he was deprived of his due process right to investigate the alleged juror misconduct when the trial court refused to allow his attorney to contact jurors who indicated they were unwilling to discuss the case. The California Court of Appeal denied the claim, finding that the court had proceeded properly under state law:

> ***Post-trial Rights of Jurors***
>
> Defendant contends it was error for the trial court to inform the jurors they had the right to refuse to discuss what occurred during jury deliberations. Defendant is incorrect...
>
> Code of Civil Procedure section 206, subdivision (a) provides that before discharging a jury the trial court must "inform the jurors that they have an absolute right to discuss or not to discuss the deliberation or verdict with anyone." A juror need only talk to a party if he or she consents and, if a discussion is attempted more than 24 hours after the verdict, the party must advise the juror of his or her absolute right not to discuss the deliberations or verdict. (§ 206, subds.(b) & (c).)
>
> Defendant maintains, however, that another provision of the Code of Civil Procedure-section 237-"contemplates that the court determine whether the juror's protest should be sustained or denied based upon particularized facts." Section 237 provides for the sealing of juror identifying information and sets forth the procedure for gaining access to such information. Anyone may petition for access to juror identifying information and, if there is a prima facie showing of good cause for disclosure, the trial court must set the matter for a hearing unless it finds a compelling interest against disclosure. (§ 237, subd. (b).) Jurors are entitled to receive notice of the hearing and may oppose the disclosure. (§ 237, subd. (c).) Section 237, subdivision (d), provides in part: "The court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure as defined in subdivision (b), or the juror is unwilling to be contacted by the petitioner."

| | |
|---|---|
| 1 | In 1995, Code of Civil Procedure section 237 was amended to add the language in subdivision (d) regarding nondisclosure when a juror is unwilling to be contacted. (Sen. Bill No. 508 (1995-1996 Reg. Sess.) 4 Stats.1995, ch. 964, § 3, pp. 7376-7377.) But even before the 1995 amendment, a juror's right to not discuss deliberations was recognized as implicit in the provisions of Code of Civil Procedure sections 206 and 237. Thus, in *Jones v. Superior Court* (1994) 26 Cal.App.4th 1202, 1208-1209, the Court of Appeal, Fourth Appellate District, Division One, held: "[N]othing in section 237 requires the court to grant access to the defendant, counsel or anyone else in the face of a 'compelling governmental interest.' Harmonizing sections 237 with 206, we conclude a juror's refusal to discuss the deliberations or verdict is a 'compelling governmental interest' sufficient to authorize the court to keep that juror's address and telephone number sealed." |
| | As noted by the People, Code of Civil Procedure section 237 does not contain any requirement that a juror discuss a case against his or her will, regardless of whether a prima facie showing of good cause for release of juror information has been made. To the contrary, subdivision (d) permits nondisclosure of a juror's identifying information if the juror is unwilling to be contacted. This is wholly consistent with Code of Civil Procedure section 206, which recognizes a juror's absolute right not to discuss deliberations with anyone. (See also *In re Hamilton* (1999) 20 Cal.4th 273, 303, fn. 23.) |
| | Defendant claims that "if jurors had a right to choose not to participate, then the statute would not require them to 'appear... to protest the granting of the petition [for disclosure of juror information]." "However, the statute permits a juror's appearance to be "in person, in writing , by telephone, or by counsel." (Code Civ. Proc., §237, subd. (C)).) Defendant does not suggest how else a juror might communicate to the court an objection to disclosure. We disagree with defendant that this language in any way "contemplates that the court determine whether the juror's protest should be sustained or denied based on particularized facts." |
| | Accordingly, the trial court did not commit error by informing the jurors they could refuse to discuss their deliberations. |

(Lodged document 5 at 11-13.)

Generally, a trial court has wide discretion in investigating allegations of juror misconduct. *Tracey v. Palmateer*, 341 F.3d 1037, 1044 n.4 (9th Cir. 2003) ("flexible approach" allowed when determining what steps to take in response to alleged juror bias or misconduct). Petitioner cites *Tanner v. Unites States*, 483 U.S. 107 (1989), and *Smith v. Phillips*, 455 U.S. 209

(1982) as support for his contention that his federal due process rights were violated when the California courts construed state law to allow jurors to refuse to discuss their deliberations with the defense. In *Tanner*, the Supreme Court held that a district court properly refused to hold an evidentiary hearing where jurors would testify on another juror's use of alcohol and drugs as barred by Federal Rule of Evidence 606(b). 483 U.S. at 117-27. In *Smith*, the Court observed that it "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." 455 U.S. at 215; *but see Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (observing that neither *Smith* nor any other Supreme Court case mandates a hearing when evidence of juror bias is raised).

Neither case cited by petitioner supports his contention. Moreover, a thorough search reveals no Supreme Court precedent regarding a criminal defendant's right to contact jurors who have expressed their unwillingness to discuss the case, or any specific rights in relation to the investigation of jury misconduct. Absent controlling precedent, petitioner is not entitled to federal habeas corpus relief. *Wright v. Van Patten*, 128 S. Ct. 743, 747 (2008) (where there is "no clear answer to the question presented," it cannot be said that the state court unreasonably applied clearly established federal law); *see also* 28 U.S.C. §2254(d)(1). Accordingly, the state appellate court's determination on this issue is not contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court.

2. Jury Misconduct

Petitioner next contends that the jury misconduct at issue denied him of his right to an impartial jury. As to this ground, the California Court of Appeal reasoned:

***Juror Misconduct/Prejudice***

> Neither party challenges the trial court's finding that misconduct occurred when, during deliberations, members of the jury discussed their observations of Fue outside the courtroom, and we agree as well with the trial court's finding. Juror misconduct occurs when a juror receives evidence from a source other than the courtroom (§ 1181, subd. 2), even if the information is received inadvertently such as here (*People v. Zapien* (1993) 4 Cal.4th 929,

14

994). Defendant contends this misconduct was prejudicial. On this point, we diverge.

It is not the case that "the improper receipt of *any* potentially prejudicial information require[s] reversal." (*In re Carpenter* (1995) 9 Cal.4th 634, 653 ( *Carpenter* ).) "Juror misconduct raises a rebuttable presumption of prejudice. The presumption may be rebutted by proof that prejudice did not actually result." (*People v. Mendoza* (2000) 24 Cal.4th 130, 195.)

Prejudice is established if, objectively, the extraneous material was "inherently and substantially likely to have influenced the juror." (*Carpenter, supra,* 9 Cal.4th at p. 653.) It can also be established by examining "the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant." (*Ibid.*)

"A trial court's finding of prejudice is based, to a significant extent, on ' "first-hand observations made in open court," ' which that court itself is best positioned to interpret." (*People v. Ault* (2004) 33 Cal.4th 1250, 1267.) Accordingly, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*People v. Nesler* (1997) 16 Cal.4th 561, 582 (lead opn. of George, C. J.), cited with approval in *Ault, supra,* at pp. 1263, 1271-1272 [holding abuse of discretion standard of review applies when trial court *grants* new trial based on juror misconduct].)

Our review of the record, here, leads us to concur with the trial court's determination that defendant suffered no prejudice from the misconduct in question, either objectively or based on actual juror bias.

We agree with the trial court that, objectively, the extraneous information was not likely to have influenced the jury. We accept the trial court's observation that Fue was not a credible witness and that his memory lapses while testifying were "comical," as the transcript of Fue's testimony supports the trial court's assessment. The court contrasted Fue's demeanor in court with his videotaped interview, in which Fue was "clear on all the essential details." Although the videotaped interview is not before this court, the transcript of that interview confirms that Fue had no difficulty with recall, in marked contrast to his responses to questions at trial. Thus, observations of Fue outside the courtroom during trial were merely cumulative of what the jury witnessed on the videotaped interview and were unlikely to have influenced the jury...

..."[I]t is virtually impossible to shield jurors from every contact or

15

> influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it...." ( *Smith v. Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78, 86].) Defendant received as much here. We conclude defendant suffered no prejudice from the jury misconduct.

(Lodged document 5 at 14-15.)

As the Ninth Circuit has explained, "evidence developed against a defendant must come from the witness stand." *Fields v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007). When the jury breaches its duty to decide the case based solely on the evidence introduced at trial, by considering extraneous facts not introduced in evidence, "a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of th extraneous evidence." *Hughes v. Borg*, 898 F.2d 695, 699 (9th Cir. 1990) (*quoting Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir. 1980). However, "the extent, if at all, to which the jurors saw or discussed the extrinsic evidence," is a question of historical fact as to which the state court's findings are entitled to a presumption of correctness. *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988); *see also* 28 U.S.C. §2254(e).

It is clearly established federal law that prejudicial extraneous influences on a jury can, under some circumstances, require the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966) (bailiff's prejudicial comments warranted reversal). "On collateral review, trial errors, such as extraneous information considered by the jury, are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict." *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008) (*citing Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997) (*citing Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)); *see also Rushen v. Spain*, 464 U.S. 114, 115-19 & n.3 (1983) (affirming state court's determination that a juror's ex parte communication with trial judge was harmless beyond a reasonable doubt); *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996) (applying harmless-error standard when a venire member stated during voir dire that he

had read in a newspaper that the defendant had "pleaded guilty at one time and changed it").

Several factors are relevant to determining whether the alleged introduction of extrinsic evidence constitutes reversible error: (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of whether the introduction of extrinsic material substantially and injuriously affected the verdict. *Estrada*, 512 F.3d at 1238; *see also Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000).

Applying the factors set forth in *Estrada*, the extrinsic evidence at issue in this case did not constitute reversible error. As determined by both the trial court and the state appellate court, it appears that the extraneous information did not substantially and injuriously influence the jury. Fue's credibility was without a doubt already in question based on his courtroom demeanor, memory deficit and overall testimony at trial, which the judge described as "comical," in contrast with his demeanor in the videotaped interview, where he was not confused, but rather, "clear on all the essential details." (Lodged document 5 at 10-11.) Moreover, according to the jurors' declarations, the discussion about Fue's demeanor outside of the courtroom was "brief," and occurred "in passing" after they had already discussed his credibility problems based on evidence properly received in the courtroom." (*Id*.) One of the three jurors to file declarations did not recall any such discussion, while none indicated facts that suggest the verdict was substantially affected. (*Id*.) Under these circumstances, the error was harmless and petitioner is not entitled to relief.

IV. CONCLUSION

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 21, 2009.

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE